## THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **JOSEPH OCCHIPINTI, et al.,** | : |
| **Plaintiffs,** | : |
| **v.** | : **3:13-CV-1875** |
| | : **(JUDGE MARIANI)** |
| **LISA BAUER, et al.,** | : |
| **Defendants.** | : |

## MEMORANDUM OPINION

### I. INTRODUCTION AND PROCEDURAL HISTORY

This matter arises in the wake of a set of failed criminal prosecutions of Joseph

Occhipinti in connection with his business dealings. After the dust settled, Joseph and

Michelle Occhipinti filed a nine count Complaint, (Doc. 1), against Detective Lisa Bauer,

former Assistant District Attorney Stephanie Tigue, former District Attorney Andrew Jarbola,

and Lackawanna County. The Complaint alleged several different causes of action under

42 U.S.C. § 1983 including false arrest, malicious prosecution, misuse of process, and

*Monell* liability, in addition to several related state law claims. (Doc. 1). After conducting

discovery, the four Defendants collectively filed a Motion for Summary Judgment. (Doc.

33). The Motion and related filings were referred to Magistrate Judge Carlson for a Report

and Recommendation ("R&R"). Upon consideration of the matter, Magistrate Judge

Carlson issued an R&R recommending that the Motion be granted in part and denied in part

with leave for the remaining Defendants to refile the Motion. (Doc. 45).

Over the objections of both parties, this Court adopted the R&R and dismissed all claims against former District Attorney ("DA") Andrew Jarbola and Lackawanna County. (Docs. 53, 54). The Court also dismissed the single claim brought by Michelle Occhipinti. (*Id.*). This left only the following claims remaining, all brought by Joseph Occhipinti ("Plaintiff"): three claims brought under 42 U.S.C. § 1983 against Detective Bauer for violation of the Fourth Amendment by way of false arrest, (Count I), malicious prosecution, (Count II), and misuse/abuse of process,[1] (Count III), a section 1983 claim against Assistant District Attorney ("ADA") Tigue for violation of the Fourth Amendment by way of false arrest and misuse/abuse of process, (Count VI), and common law claims against Detective Bauer for false arrest, malicious prosecution, and misuse/abuse of process, (Count VIII). As for these claims, this Court agreed with the R&R that, because both parties had failed to comply with Local Rule 56.1, it was impossible to determine what facts, if any, were undisputed. (Doc.53). The Court therefore allowed Detective Bauer and ADA Tigue ("Defendants") to refile their summary judgment motion on the limited issue of whether Defendants were entitled to any immunity from liability. (Doc. 54).

---

[1] Although neither party raises the issue, the Court notes that "abuse of process is by definition a denial of procedural due process." *Jennings v. Shuman,* 567 F.2d 1213, 1220 (3d Cir. 1977). As such, a claim for abuse of process is actionable under 42 U.S.C. § 1983 as a violation of a person's Fourteenth Amendment rights, not Fourth Amendment rights.

Defendants refiled their Motion on October 28, 2016. (Doc. 58). The Motion has now been fully briefed and is ripe for decision.[2] For the reasons that follow, this Court will grant in part and deny in part Defendants' Amended Motion for Summary Judgment.

## II. STATEMENT OF UNDISPUTED FACTS

In accordance with Local Rule 56.1, Defendants submitted a Statement of Material Facts in Support of their Amended Motion for Summary Judgment, (Doc. 60), as to which they contend that there is no genuine dispute for trial, and Plaintiff submitted a response, (Doc. 63). Thus, the following facts have been admitted, except as specifically noted:

Plaintiff was a minority owner and corporate secretary of State Petroleum Distributors ("SPD"), a gasoline distribution company. (Doc. 60 at ¶¶ 1-2; Doc. 63 at ¶¶ 1-2). In February of 2018, Plaintiff contacted an owner of a supermarket, William Bracey, and offered to let Bracey prepay for gasoline to insulate his business against rising fuel prices. (Doc. 60 at ¶ 4; Doc. 63 at ¶ 4). Bracey agreed, and the arrangement went as planned for several months. (Dep. of Lisa Bauer, Doc. 64-4 at 5; Dep. of William Bracey, Doc. 59-1 at 376-377).

Then, in early August, 2008, Plaintiff spoke again with Bracey about prepaying for gasoline at a set price of $3.10 per gallon. (Doc. 60 at ¶ 13; Doc. 63 at ¶ 13). According to Bracey, he questioned Plaintiff about SPD's financial status and was assured by Plaintiff that SPD was not having money troubles. (Doc. 60 at ¶¶ 44-45; Doc. 63 at ¶ 44-45). SPD,

---

[2] Plaintiff filed a request for oral argument on Defendants' Motion. (Doc. 66). Upon review of the materials and law pertaining to this matter, the Court finds oral argument unnecessary.

however, was experiencing cash flow problems in 2008. (Doc. 60 at ¶ 12; Doc. 63 at ¶ 12). Beginning in February of 2008, SPD began to bounce checks to the Pennsylvania Department of Revenue. (Doc. 60 at ¶ 6; Doc. 63 at ¶ 6). In April, one of SPD's lenders filed suit against the company, alleging that SPD defaulted on its loan agreement with the lender. (Doc. 60 at ¶ 5; Doc. 63 at ¶ 5). By the time Plaintiff talked with Bracey in mid-August, SPD did not have credit with any of its gas suppliers. (Doc. 60 at ¶ 17; Doc. 63 at ¶ 17).

On August 15, 2008, pursuant to their prepay agreement, Bracey forwarded a check to SPD in the amount of $500,000. (Doc. 60 at ¶ 14; Doc. 63 at ¶ 14). That check was deposited three days later in SPD's bank account at Community Bank & Trust. (Doc. 60 at ¶ 18; Doc. 63 at ¶ 18). On the same day of the deposit, $500,000 was transferred from SPD's bank account to a bank account of a different corporate entity, RHL, Inc. ("RHL"). (Doc. 60 at ¶¶ 18-19; Doc. 63 at ¶¶ 18-19). The only signatories on both SPD's bank account and RHL's bank account were Plaintiff and the president of SPD and RHL, Robert Lambert. (Doc. 60 at ¶¶ 21-22; Doc. 63 at ¶¶ 21-22; Dep. of Robert Lambert, Doc. 59-1 at 213). At the time of the transfer, the RHL bank account was overdrawn by over $285,000 and a portion of the $500,000 went to cover this overdraft. (Doc. 60 at ¶ 20; Doc. 63 at ¶¶ 20, 33).

Within a few days of issuing the check, Bracey was unable to get fuel from SPD. (Doc. 60 at ¶ 16; Doc. 63 at ¶ 16). In the end, SPD only supplied $53,000 worth of gasoline

for Bracey's mid-August prepayment of $500,000. (Doc. 60 at ¶ 15; Doc. 63 at ¶ 15). After making at least one phone call to Plaintiff about the missing fuel, Bracey contacted the Lackawanna County District Attorney's Office. (Doc. 60 at ¶¶ 39, 42; Doc. 63 at ¶¶ 39, 42). Thereafter, the investigation was assigned to Detective Bauer. (Doc. 60 at ¶ 39; Doc. 63 at ¶ 39). Bauer interviewed Bracey and was informed about the prepay arrangement, the $500,000 check, the missing gasoline, the fact that Bracey had dealt with Plaintiff on behalf of SPD, and the assurance Plaintiff had given Bracey about SPD's solvency. (Doc. 60 at ¶¶ 40-41, 43-45; Doc. 63 at ¶¶ 40-41, 43-45).

On April 16, 2009, a three count criminal complaint was filed charging Plaintiff with theft by deception, receiving stolen property, and deceptive or fraudulent business practices. (Doc. 64-4 at 28-29). These charges were eventually withdrawn and replaced with a single count of theft by failure to make required disposition of funds received. (Doc. 64-9 at 3; Dep. of Lisa Bauer, Doc. 64-4 at 11). A preliminary hearing was then held on January 25, 2010, in which ADA Patricia Lafferty represented the Commonwealth. (Jan. 25, 2010 Prelim. Hr'g Tr., Doc. 64-15 at 2; Doc. 64-9 at 3). At the hearing, Bracey testified that he did not personally hand the $500,000 check to Plaintiff and that Bracey did not know if anyone who worked for his company had handed Plaintiff the $500,000 check. (Jan. 25, 2010 Prelim. Hr'g Tr., Doc. 64-15 at 3). Detective Bauer was at this hearing and heard Bracey testify. (Dep. of Lisa Bauer, Doc. 64-4 at 12). Thereafter, the judge dismissed the charges against Plaintiff. (Doc. 64-9 at 3).

5

On February 1, 2011, Bracey met with Detective Bauer again and showed her copies of the bank records of SPD and RHL. (Dep. of Lisa Bauer, Doc. 64-4 at 16-18). This sparked a second criminal investigation where Detective Bauer spoke with the owner of one of SPD's gasoline suppliers, reviewed the bank records of SPD and RHL, and reviewed depositions Lambert had given in a related civil lawsuit. (Doc. 60 at ¶ 46; Doc. 63 at ¶ 46). At this time, ADA Tigue was assigned to the case and reviewed the evidence with Detective Bauer. (Doc. 60 at ¶ 49; Doc. 63 at ¶ 49). On July 13, 2011, DA Andrew Jarbola and ADA Tigue made the decision to refile a criminal charge against Plaintiff. (Doc. 60 at ¶ 51; Doc. 63 at ¶ 51). Detective Bauer drafted a new police criminal complaint and new affidavit of probable cause. (Doc. 59-1 at 142-47). The new criminal complaint, approved by ADA Tigue, was refiled on July 13, 2011, and contained a single charge against Plaintiff for theft by failure to make required disposition of funds received. (Doc. 60 at ¶¶ 52-53; Doc. 63 at ¶¶ 52-53). That same day, a judge approved the refiled charge and issued an arrest warrant for Plaintiff. (Doc. 60 at ¶ 54; Doc. 63 at ¶ 54).

A preliminary hearing on the refiled charge was held on November 22, 2011. (Doc. 64-9 at 3). The charges were thereafter bound over for trial. (*Id.*). Plaintiff then filed a writ of habeas corpus, alleging that the Commonwealth could not establish that a crime had occurred. (*Id.* at 4). The trial court agreed, and dismissed the charges against him on April 27, 2012. (Doc. 64-8). The Commonwealth appealed the trial court's decision, and, in an

6

unpublished opinion, the Superior Court affirmed, finding that there was no probable cause that a crime had been committed. (Doc. 64-9).

Plaintiff subsequently filed the present lawsuit alleging that the events surrounding the second criminal prosecution violated several of his constitutional rights and gave rise to liability under several common law causes of action. (Doc. 1).

## III. STANDARD OF REVIEW

Through summary adjudication, the court may dispose of those claims that do not present a "genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). "As to materiality, . . . . [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

The party moving for summary judgment bears the burden of showing the absence of a genuine issue as to any material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). Once such a showing has been made, the non-moving party must offer specific facts contradicting those averred by the movant to establish a genuine issue of material fact. *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 888, 110 S. Ct. 3177, 111 L. Ed. 2d 695 (1990). Therefore, the non-moving party may not oppose summary judgment simply on the basis of the pleadings, or on conclusory statements that a factual issue exists. *Anderson*, 477 U.S. at 248. "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the

record . . . or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A)-(B). In evaluating whether summary judgment should be granted, "[t]he court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). "Inferences should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Big Apple BMW, Inc. v. BMW of N. Am., Inc.,* 974 F.2d 1358, 1363 (3d Cir. 1992), *cert. denied* 507 U.S. 912, 113 S. Ct. 1262, 122 L. Ed. 2d 659 (1993).

However, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007). If a party has carried its burden under the summary judgment rule,

> its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact. When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.

*Id.* (internal quotations, citations, and alterations omitted).

8

## IV. ANALYSIS

Defendants argue that (1) the section 1983 claims against ADA Tigue are barred by the doctrine of absolute immunity, (2) the section 1983 claims against Detective Bauer and ADA Tigue are barred by the doctrine of qualified immunity, and (3) the state law claims against Detective Bauer are barred by official immunity. (Doc. 59 at 14-27). The Court will address each argument in turn.

### A. Absolute Immunity

Defendants first argue that ADA Tigue is absolutely immune from Plaintiff's section 1983 false arrest claim.[3] (Doc. 59 at 14-17). "[P]rosecutors are subject to varying levels of official immunity and absolute prosecutorial immunity attaches only to actions performed in a quasi-judicial role, such as participation in court proceedings and other conduct intimately associated with the judicial phases of litigation." *Carter v. City of Phila.*, 181 F.3d 339, 356 (3d Cir. 1999) (quotation marks omitted). For example, "[t]he decision to initiate a prosecution is at the core of a prosecutor's judicial role," and therefore "[a] prosecutor is absolutely immune when making this decision, even where he acts without a good faith belief that any wrongdoing has occurred." *Kulwicki v. Dawson*, 969 F.2d 1454, 1463-64 (3d Cir. 1992). By contrast, "[a] prosecutor's administrative duties and those investigatory functions that do not relate to an advocate's preparation for the initiation of a prosecution or

---

[3] As explained in the next section, ADA Tigue is entitled to qualified immunity on Plaintiff's abuse of process claim. *See* discussion *infra* Section IV.B. Therefore, the Court does not address whether she is also entitled to absolute immunity for that claim.

for judicial proceedings are not entitled to absolute immunity." *Buckley v. Fitzsimmons*, 509

U.S. 259, 273, 113 S. Ct. 2606, 125 L. Ed. 2d 209 (1993).

The distinction arises because, "the actions of a prosecutor are not absolutely

immune merely because they are performed by a prosecutor." *Id.* As the Supreme Court

has explained,

> [t]here is a difference between the advocate's role in evaluating evidence and interviewing witnesses as he prepares for trial, on the one hand, and the detective's role in searching for the clues and corroboration that might give him probable cause to recommend that a suspect be arrested, on the other hand. When a prosecutor performs the investigative functions normally performed by a detective or police officer, it is "neither appropriate nor justifiable that, for the same act, immunity should protect the one and not the other."

*Id.* (quoting *Hampton v. Chicago*, 484 F.2d 602, 608 (7th Cir. 1973)). Further, "[a]

prosecutor may not shield his investigative work with the aegis of absolute immunity merely

because, after a suspect is eventually arrested, indicted, and tried, that work may be

retrospectively described as 'preparation' for a possible trial." *Id.* at 276.

With respect to the conduct at issue in the present case, "[c]ourts have held that the

determination whether the giving of advice or direction to the police is a core prosecutorial

function depends upon whether the advice or direction was given before or after the filing of

charges." *Spiker v. Allegheny Cty. Bd. of Probation & Parole*, 920 F. Supp. 2d 580, 600

(W.D. Pa. 2013). For example, in *Burns v. Reed*, 500 U.S. 478, 111 S. Ct. 1934, 114 L. Ed.

2d 547 (1991), Burns was the subject of an investigation into the shooting of her two sons.

500 U.S. at 481-82. The police sought to interview Burns under hypnosis, but were

10

concerned that hypnosis might be an unacceptable investigatory technique. *Id.* at 482. The police therefore sought the advice of the Chief Deputy Prosecutor, Reed, who told the officers to proceed with hypnosis. *Id.* The police then interviewed Burns while she was hypnotized and she made several incriminating statements. *Id.* Based on these statements, Reed advised the police that there was "probably" probable cause to arrest Burns. *Id.* Burns was arrested, but the charges were eventually dropped. *Id.* at 482-83.

Addressing the question of whether Reed's legal advice was entitled to absolute immunity, the Supreme Court held "that advising the police in the investigative phase of a criminal case is [not] so intimately associated with the judicial phase of the criminal process that it qualifies for absolute immunity." *Id.* at 493 (internal citations and quotation marks omitted). The Court found that it was "incongruous to allow prosecutors to be absolutely immune from liability for giving advice to the police, but to allow police officers only qualified immunity for following the advice." *Id.* at 495.

Here, viewing the evidence in a light most favorable to Plaintiff, there is a dispute of fact as to whether ADA Tigue was involved in the investigation and in advising Detective Bauer with respect to Bauer's investigation. Detective Bauer testified in her deposition that ADA Tigue directed Bauer's second criminal investigation. (Dep. of Lisa Bauer, Doc. 64-4 at 21). They had several meetings together and reviewed the entire file, including information from the first criminal action. (*Id.* at 21-22). According to Detective Bauer, "[e]verything that's in the Affidavit [of Probable Cause] was discussed with Assistant D.A.

Tigue. Everything that's in this Affidavit was brought to her for her approval." (*Id.* at 21).
Further, according to ADA Tigue, she directed Bauer to conduct additional investigation
before the criminal charges were filed. (Dep. of Stephanie Tigue, Doc. 64-11 at 4).

It is beyond doubt that ADA's Tigue's decision to refile the charges against Plaintiff is
protected by absolute immunity. *See Kulwicki*, 969 F.2d at 1463-64. If, however, Plaintiff is
able to prove at trial that ADA Tigue advised or helped Detective Bauer draft the affidavit of
probable cause in order to obtain a warrant for Plaintiff's arrest, those actions would not be
entitled to absolute immunity. *See Burns*, 500 U.S. at 493-95; *Walker v. Clearfield Cty. Dist.
Attorney*, 413 F. App'x 481, 483 (3d Cir. 2011) (holding that "when prosecutors perform
investigatory functions, like determining whether there is probable cause to arrest a suspect,
they are entitled only to qualified, and not absolute, immunity"); *Spiker*, 920 F. Supp. 2d at
600 (finding that the prosecutor-defendant was not entitled to absolute immunity for
directing a police officer to obtain an arrest warrant). Consequently, there are disputes of
material fact that prevent this Court from dismissing the section 1983 false arrest claim
against ADA Tigue on the basis of absolute prosecutorial immunity.

## B. Qualified Immunity

Next, Defendants argue that Detective Bauer and ADA Tigue are entitled to qualified
immunity with respect to all of the section 1983 claims against them. (Doc. 59 at 17-25).
"The doctrine of qualified immunity protects government officials 'from liability for civil
damages insofar as their conduct does not violate clearly established statutory or

12

constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982)). The doctrine serves the dual purpose of holding government officials accountable when their power is exercised unreasonably and protecting those officials from "harassment, distraction, and liability when they perform their duties reasonably." *Id.* "Qualified immunity applies regardless of whether the government official's error is 'a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.'" *Id.* (citing *Groh v. Ramirez*, 540 U.S. 551, 567, 124 S. Ct. 1284, 157 L. Ed. 2d 1068 (2004) (Kennedy, J., dissenting)).

The qualified immunity doctrine "provides not only a defense to liability, but 'immunity from suit.'" *Dull v. W. Manchester Twp. Police Dep't*, 604 F. Supp. 2d 739, 748 (M.D. Pa. 2009) (quoting *Hunter v. Bryant*, 502 U.S. 224, 227, 112 S. Ct. 534, 116 L. Ed. 2d 589 (1991)). "[I]n reviewing a motion for summary judgment on the basis of qualified immunity, normal principles of summary judgment still apply, and any disputes of fact must be resolved in favor of the plaintiff." *Estate of Smith v. Marasco*, 430 F.3d 140, 148 n.3 (3d Cir. 2005).

In *Saucier v. Katz*, 533 U.S. 194, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001), the Supreme Court articulated a two-step test to determine the appropriate application of qualified immunity. A court must decide: (1) whether the facts alleged by the plaintiff violate a constitutional right; and (2) if so, whether that right was "clearly established" at the time of

13

the alleged violation. *Id.* at 201. However, the *Saucier* procedure, which erected a rigid framework, no longer mandates that district courts decide the two prongs in any particular order. *Pearson*, 555 U.S. at 236. The decision is left to the discretion of the district court. *Id.*

Here, Defendants argue that Detective Bauer and ADA Tigue are entitled to qualified immunity for Plaintiff's section 1983 claim against them for violation of the Fourth Amendment by way of a false arrest. (Doc. 59 at 19-24). With respect to the first *Saucier* prong of whether a constitutional right was violated, it is undisputed that Plaintiff was arrested pursuant to a warrant. (Doc. 60 at ¶ 54, Doc. 63 at ¶ 54). "The mere existence of an arrest warrant, however, does not shield an officer from liability for false arrest." *Goodwin v. Conway*, 836 F.3d 321, 327 (3d Cir. 2016).

> Rather, a plaintiff may succeed in a § 1983 action for false arrest made pursuant to a warrant if the plaintiff shows, by a preponderance of the evidence: (1) that the police officer "knowingly and deliberately, or with a reckless disregard for the truth, made false statements or omissions that create a falsehood in applying for a warrant;" and (2) that "such statements or omissions are material, or necessary, to the finding of probable cause."

*Wilson v. Russo*, 212 F.3d 781, 786-87 (3d Cir. 2000) (quoting *Sherwood v. Mulvihill*, 113 F.3d 396, 399 (3d Cir. 1997)). "Omissions and misrepresentations are 'material' if a reconstructed warrant application containing the alleged omissions and excising the alleged inaccuracies would no longer establish probable cause." *Goodwin*, 836 F.3d at 327.

Plaintiff in this case was arrested for theft by failure to make required disposition of funds received. That criminal statute provides that

14

A person who obtains property upon agreement, or subject to a known legal obligation, to make specified payments or other disposition, whether from such property or its proceeds or from his own property to be reserved in equivalent amount, is guilty of theft if he intentionally deals with the property obtained as his own and fails to make the required payment or disposition.

18 Pa. C.S.A. § 3927(a). The Pennsylvania Supreme Court has interpreted this criminal offense as consisting "of four elements: 1) the obtaining of the property of another; 2) subject to an agreement or known legal obligation upon the receipt to make specified payments or other disposition thereof; 3) intentional dealing with the property obtained as the defendant's own; and 4) failure of the defendant to make the required disposition of the property." *Commonwealth v. Morrissey*, 654 A.2d 1049, 1052 (Pa. 1995).

There appears to be no dispute that there was probable cause with respect to element two and four of the offense because the parties agree that Bracey issued a check in the amount of $500,000 for gasoline, but only received approximately $53,000 of gasoline. (Doc. 60 at ¶¶ 14-15; Doc. 63 at ¶¶14-15). Thus, the dispute centers on whether there was probable cause at the time of the arrest to believe that Plaintiff "obtained" the money from Bracey (element one) and that Plaintiff dealt with the money as his own (element three). Specifically, Plaintiff contention is that Detective Bauer's affidavit of probable cause contained several false or misleading statements that were material to a finding that probable cause existed as to these elements of the crime.

"[W]hen a court determines that information was asserted or omitted in an affidavit of probable cause with at least reckless disregard for the truth, it must perform a word-by-word

15

reconstruction of the affidavit." *Dempsey v. Bucknell Univ.*, 834 F.3d 457, 470 (3d Cir. 2016); *see also Andrews v. Scuilli*, 853 F.3d 690, 700 (3d Cir. 2017). "An assertion is made with reckless disregard when 'viewing all the evidence, the affiant must have entertained serious doubts as to the truth of his statements or had obvious reasons to doubt the accuracy of the information he reported.'" *Wilson*, 212 F.3d at 788 (quoting *United States v. Clapp*, 46 F.3d 795, 801 n.6 (8th Cir. 1995)).

Here, Plaintiff has identified several misleading assertions in the affidavit of probable cause. Reviewing the evidence in a light most favorable to Plaintiff, and resolving all factual disputes in favor of Plaintiff, the Court agrees that a reasonable jury could find that several statements in the affidavit were misleading and made with reckless disregard for the truth. First, the affidavit states that "Mr. Bracey prepaid Mr. Occhipinti $500,000." (Doc 59-1 at 146). Plaintiff points out that Detective Bauer knew this statement was not true because she had attended the first preliminary hearing and heard Bracey testify that he did not personally hand Plaintiff the check. (Doc. 64 at 17; Dep. of Lisa Bauer, Doc. 64-4 at 12). The Court agrees that a reasonable jury could find this assertion misleading as it implies that Plaintiff personally received the check. Further, a reasonable jury could determine that Detective Bauer must have entertained serious doubts about the truth of this statement given Bracey's testimony at the first preliminary hearing. Second, the affidavit states that the bank records show that "Mr. Occhipinti deposited the money into" SPD's account. (Doc. 59-1 at 146). Plaintiff argues that because Detective Bauer knew that Plaintiff never

16

received the check, she would also know that it was not deposited in the SPD account by Plaintiff. (Doc. 64 at 17). Again, a reasonable jury could conclude that this statement is misleading as it implies that Plaintiff personally handled the check. Further, in light of the testimony Detective Bauer heard prior to writing the affidavit, a reasonable jury could find that she had reason to doubt the truth of this statement.[4]

Third, the affidavit repeatedly refers to "Mr. Occhipinti" in reference to certain bank accounts, bank records, monetary debts, and monetary transactions, when the bank accounts and bank records belonged to SPD or RHL, and the debts and transactions were in SPD or RHL's name. (Doc. 59-1 at 145-47; Doc. 64 at ¶ 55). The Court agrees that a reasonable jury could determine that the affidavit of probable cause is misleading in this respect and that Detective Bauer had reason to doubt the truth of those statements because she had the bank records in her possession.[5]

---

[4] Defendants argue that Plaintiff has admitted that he deposited the $500,000 into SPD's bank account and that he has "essentially admitted" that he personally received the check from Bracey. (Doc. 59 at 19, 24). Defendants point to Plaintiff's deposition testimony where Plaintiff was asked if he could identify any false statements in a portion of the affidavit of probable cause that read, in part, that "[a] check of Mr. Occhipinti's bank accounts at Community Bank & Trust revealed that two days after receiving the $500,00.00 payment, Mr. Occhipinti deposited the money into State Petroleum Distributors." (Dep. of Joseph Occhipinti, Doc. 59-1 at 31; Doc. 59-1 at 146). Plaintiff responded "Not that I see, from what he's told her. I don't know." (Dep. of Joseph Occhipinti, Doc. 59-1 at 31). Viewing the evidence in a light most favorable to Plaintiff, this equivocal response is not an admission because Plaintiff stated that he did not know if the paragraph contained any false statements.

[5] Plaintiff also identifies other elements of the affidavit of probable cause that Plaintiff maintains are incorrect or misleading. (Doc. 64 at ¶ 55). Plaintiff, however, fails to point to anything in the record that would indicate that Detective Bauer had reason to doubt these statements at the time she wrote the affidavit of probable cause.

17

The Court, as required by *Dempsey*, now reconstructs the affidavit of probable

cause. *Dempsey*, 834 F.3d at 470; *see also Andrews*, 853 F.3d at 700. The corrected

affidavit reads as follows:

> I am Detective Lisa M. Bauer of the Lackawanna County District Attorney's Office. I have been employed in this capacity for approximately 23 years, and I am assigned to conducting criminal investigations within Lackawanna County, Pennsylvania.
>
> This Detective met with one Mr. William Bracey, owner of Bill's Supermarkets & Convenient Stores, RR Box 6220, Moscow, Pennsylvania 18444, regarding a theft of approximately five hundred thousand dollars ($500,000.00). Mr. Bracey stated that he has been doing business with one Joseph Occhipinti, t/a **[a minority shareholder and representative of]** State Petroleum Distributors, 104 Lake Street, Dunmore, PA 18512, since November 2004. Mr. Occhipinti **[on behalf of State Petroleum Distributors]** and Mr. Bracey entered into an agreement wherein ~~Mr. Occhipinti~~ **[State Petroleum Distributors]** offered Mr. Bracey a discount of 3-4 cents per gallon if he prepaid for gasoline, and in a time period of approximately two (2) years, Mr. Bracey has prepaid ~~Mr. Occhipinti~~ **[State Petroleum Distributors]** for an average of approximately 75,000 gallons of gasoline per week.
>
> Mr. Bracey made the following gasoline prepayments to ~~Mr. Occhipinti~~ **[State Petroleum Distributors]** in 2008:
>
> | | |
> |---|---|
> | 02/02/2008 - $495,000.00 | 06/14/2008 - $250,000.00 |
> | 03/01/2008 - $400,000.00 | 06/24/2008 - $350,000.00 |
> | 04/19/2008 - $500,000.00 | 07/04/2008 - $350,000.00 |
> | 05/17/2008 - $300,000.00 | 07/09/2008 - $450,000.00 |
> | 05/21/2008 - $150,000.00 | 07/26/2008 - $500,000.00 |
> | 05/24/2008 - $300,000.00 | 08/02/2008 - $500,000.00 |
> | 05/30/2008 - $150,000.00 | 08/15/2008 - $500,000.00 |
> | 06/05/2008 - $350,000.00 | |
>
> On or about August 18, 2008, Mr. Bracey prepaid ~~Mr. Occhipinti~~ **[State Petroleum Distributors]** $500,000.00 with check number 132521, dated August 15, 2008, drawn on First National Community Bank, and made

18

payable to State Petroleum Distributors. ~~Mr. Occhipinti~~ **[State Petroleum Distributors]** delivered two loads of gasoline, the final delivery being on August 23, 2008, totaling $53,278.22, and when Mr. Bracey called Mr. Occhipinti to deliver more gas, he stated he was having problems getting gas, and that he was working on it. ~~Mr. Occhipinti~~ **[State Petroleum Distributors]** still owed Mr. Bracey $446,721.78 in gasoline.

A check of ~~Mr. Occhipinti's~~ **[State Petroleum Distributors']** bank accounts at Community Bank & Trust revealed that two days after receiving the $500,000.00 payment, ~~Mr. Occhipinti~~ **[State Petroleum Distributors]** deposited the money into State Petroleum Distributors, Inc. Account #1000199931 at Community Bank & Trust in Clarks Summit, Pennsylvania. This account bears the signatures of Joseph Occhipinti and Robert Lambert. Also on August 18, 2008, the said $500,000.00 to Account #800329571 at Community Bank & Trust, Clarks Summit, PA, in the name of RHL, Inc. t/a Petroleum Services, said account bearing the signatures of Joseph Occhipinti and Robert Lambert. The only two people who had the authority to transfer the funds was Mr. Occhipinti and Mr. Lambert, and Mr. Lambert stated that he knew nothing about said transfer. After the $500,000.00 transfer, Account #800329571 had a balance of $63,928.22, which shows that this account was overdrawn by $436,071.78 at the time of the deposit. The very next day, August 19, 2008, the same account had a balance of negative $-3,343.21, and subsequent checks continued to bounce from this account. Mr. Bracey contacted Mr. Occhipinti several times, to receive the shipments of gasoline owed him, and Mr. Occhipinti advised that he was going to take care of it, but failed to do so. Mr. Bracey needed gasoline, so he had to contact Santarelli Oil Company to fill his gasoline tanks, and had to pay for the gas that he received from Santarelli Oil Company since ~~Mr. Occhipinti~~ **[State Petroleum Distributors]** failed to deliver said gasoline. Moreover, Mr. Bracey received a shipment of gasoline purportedly from Mr. Occhipinti, but subsequently received a bill from an oil company named Isobunkers for the same shipment. Mr. Bracey advised Isobunkers that he had already paid ~~Mr. Occhipinti~~ **[State Petroleum Distributors]** for the gasoline and Isobunkers told Mr. Bracey that they delivered the gasoline at the direction of Mr. Occhipinti, with the understanding between Isobunkers and Mr. Occhipinti that Isobunkers bill Mr. Bracey for the gasoline. Isobunkers were not aware that Mr. Bracey had prepaid ~~Mr. Occhipinti~~ **[State Petroleum Distributors]** and were in no way part of that prepayment agreement.

19

On March 30, 2011, Mr. Lambert was deposed at the Law Offices of John J. Mercuri before Notary Public Kelly Graff, and during this deposition, Mr. Lambert was shown check #132521 dated August 15, 2008, in the amount of $500,000.00, and he was asked if he was familiar with that check. Mr. Lambert stated "well, this is the first I've ever seen it." Mr. Lambert was then asked, "and you're the only signatories on that account, are you not?" to which he replied "yes". Mr. Lambert was then asked, "what did you have to do with that Community Bank account around that time?" to which he replied, "Nothing. I had no dealings on a daily basis with any of the banking.

Mr. Lambert was then asked, "Well, the authorized signatories on the Community Bank account in the name of RHL, Inc., again, was you and Joseph Occhipinti, right?" Mr. Lambert replied, "yes." He was then asked, "and you were the only authorized signatories on the RHL, Inc. account, is that right?["] He replied, "yes". He was subsequently asked, "O'kay, and do you have any knowledge or recollection of Mr. Bracey's $500,000.00 being transferred from the State Petroleum account at Community Bank to the RHL account at Community Bank on August 18th of 2008?" He replied, "I do not".

This Detective interviewed one Joseph Gentile, owner of Dunmore Oil Company. This Detective asked Mr. Gentile if he had occasion to deal with either Mr. Occhipinti or his partner, Mr. Lambert, and Mr. Gentile advised that he dealt with Mr. Occhipinti and he provided gasoline to Mr. Occhipinti. This Detective then asked Mr. Gentile how Mr. Occhipinti would pay for the gasoline he ordered, and Mr. Gentile stated that he would order and then pay for gasoline. This Detective asked Mr. Gentile whether or not he would ever have allowed Mr. Occhipinti to be past due, and still deliver gasoline to him, and Mr. Gentile advised that Mr. Occhipinti had to pay any outstanding balance due on gasoline deliveries prior to any subsequent deliveries of gasoline.

A further check of Mr. Occhipinti's [State Petroleum Distributors and RHL's] bank records from Community Bank & Trust Company, account number 800329571 revealed that Mr. Occhipinti[,] issued [on behalf of RHL, signed] check number 4082 in the amount of $93,672.54 dated August 18, 2008, Check number 4083 in the amount of $57,170.34 dated August 18, 2008, and check number 4085 in the amount of $23,849.43 dated August 18, 2008[, all drawn on RHL's account,] to Mr. Gentile. Mr. Gentile stated that he had called Community Bank & Trust Company, and was advised that Mr. Occhipinti [RHL] did not have the funds to cover these checks, so Mr.

20

Gentile never deposited the checks into his account. Mr. Occhipinti then[,] issued [on behalf of RHL, signed] check number 4086 in the amount of $57,171.34 dated August 19, 2008, check number 4087 in the amount of $23,850.43 dated August 19, 2008, check number 4088 in the amount of $150,000 dated August 22, 2008, check number 4089 in the amount of $93,673.54 dated August 19, 2008, and check number 4091 in the amount of $150,000.00 dated August 26, 2008[, all drawn on RHL's account,] to Dunmore Oil to pay an outstanding balance owed to Mr. Gentile. It should be noted that the reason that Mr. Occhipinti was having such a hard time getting gasoline was because he [State Petroleum Distributors] was already in debt to Dunmore Oil and Mr. Gentile would not deliver any more gasoline until Mr. Occhipinti's [State Petroleum Distributors'] debt was paid.

Furthermore, prior to Mr. Gentile dealing with Mr. Occhipinti, Mr. Occhipinti provided Mr. Gentile with a copy of a Commonwealth of Pennsylvania Department of Revenue 2008-09 Liquid Fuels and Fuels Tax Permit stating that State Petroleum Distributors, Inc. had been granted a liquid fuels and fuels tax permit stating that State Petroleum Distributors, Inc. was entitled to handle non-taxable fuel. The effective date on this Permit is 06/01/2008, and the expiration date is listed as 05/31/2009. A check with the Department of Revenue revealed that State Petroleum Distributors, Inc. did have a permit, but the actual permit was effective on 10/01/1997, and expired on 05/31/2008. The permit that was submitted to Dunmore was fraudulent, and during his deposition, Mr. Lambert was asked, "And as far as you know, you never signed an application for this liquid fuels license for 2008?" Mr. Lambert stated, "as far as I know, no." "The only thing I would say as I've stated before, I had no function with the daily operations of the cash management of the business from the time I returned after my wife passed away in March of 2008. My whole function was working on mergers and acquisitions for this company, either a merger, an acquisition, or raising capital. I had no daily functions with these entities. Again, it wasn't my function. I didn't have anything to do with it".

(Doc. 59-1 at 145-47).

The next step is to determine whether the corrected affidavit gives rise to probable cause. "Probable cause exists if there is a 'fair probability' that the person committed the crime at issue." *Wilson*, 212 F.3d at 789 (quoting *Sherwood*, 113 F.3d at 401). The Third

21

Circuit has instructed that, generally, "the question of probable cause in a section 1983 damage suit is one for the jury." *Montgomery v. De Simone*, 159 F.3d 120, 124 (3d Cir. 1998); *see also Estate of Smith*, 318 F.3d at 514. "The district court may conclude in the appropriate case, however, that probable cause did exist as a matter of law if the evidence, viewed most favorably to Plaintiff, reasonably would not support a contrary factual finding." *Sherwood*, 113 F.3d at 401.

Here, viewing the evidence in a light most favorable to Plaintiff, the Court cannot say that probable cause existed as a matter of law at the time of Plaintiff's arrest. The original affidavit indicated that Plaintiff received the check from Bracey, placed it into SPD's account, transferred it to a different corporate account, and attempted to use the money to pay debts *Plaintiff* owed to Dunmore Oil. The corrected affidavit, however, specifies that SPD received the check from Bracey, the money was transferred into RHL's account, and that Plaintiff issued checks on behalf of RHL in an attempt to pay RHL or SPD's debts. In Pennsylvania, "[i]t is well established that a corporation is a distinct and separate entity, irrespective of the persons who own all its stock." *Barium Steel Corp. v. Wiley*, 108 A.2d 336, 341 (Pa. 1954). Indeed, even if one person owns all of the corporate stock, that "does not make him and the corporation one and the same person, nor does he thereby become the owner of all the property of the corporation." *Id*. In order to hold an individual criminally liable for the acts of a corporation there must be proof that "the individual personally so dominated and controlled the corporation as to immediately direct its action."

22

*Commonwealth v. Wood*, 637 A.2d 1335, 1344 (Pa. Super. Ct. 1994) (quoting *Commonwealth v. Miller*, 606 A.2d 495, 497 (Pa. Super. Ct. 1992)).

A reasonable jury in this case could conclude that the corrected affidavit does not give rise to probable cause to believe that Plaintiff controlled SPD and RHL as to immediately direct its action. Further, a reasonable jury could find that the corrected affidavit gives rise to the inference that Plaintiff was acting on SPD and RHL's behalf, and not on his own behalf. In such a case, the jury could reasonably determine that there was no probable cause that Plaintiff committed a criminal offence. Accordingly, a genuine dispute of fact precludes the Court from concluding that no constitutional right was violated by Detective Bauer with respect to the section 1983 false arrest claims.[6] Further, as discussed in the prior section, ADA Tigue's role in formulating the affidavit is, at best, unclear at this stage in the litigation. Thus, the Court similarly cannot hold that ADA Tigue's actions with respect to the affidavit did not violate Plaintiff's constitutional rights.

Turning to the second prong of the analysis, Defendants are still entitled to qualified immunity if the constitutional right violated was not "clearly established." As discussed

---

[6] In their brief, Defendants cite to eleven "undisputed" facts that they contend support Plaintiff's arrest. (Doc. 59 at 20-21). The Court need not dwell on these long. It is clear from the record that not all of the facts are undisputed. For example, Defendants argue that it is an undisputed fact that "the funds in the RHL account were used for Occhipinti's benefit." (Doc. 59 at 21). As already discussed, the record supports the proposition that the RHL account was a corporate account and was used by Plaintiff to purchase gasoline *on behalf of SPD*. (Dep. of Robert Lambert, Doc. 64-6 at 8). Thus, the question of whether Plaintiff used the RHL account for his own benefit is disputed. Furthermore, much of the record evidence that Defendants cite to in arguing that this fact is undisputed—such as the RHL account being used to pay for a series of mini-mart business owned by Plaintiff—does not appear in the affidavit of probable cause and is thus of little relevance to this analysis. Finally, Defendants have not shown that this additional evidence was known by Detective Bauer or ADA Tigue at the time of Plaintiff's arrest.

above, there are genuine disputes of fact as to whether statements made in the affidavit of

probable cause were false and whether the falsehoods were made deliberately or with

reckless disregard for the truth.[7] When a detective "submits an affidavit containing

statements [s]he knows to be false or would know are false if [s]he had not recklessly

disregarded the truth, the [detective] obviously failed to observe a right that was clearly

established." *Lippay v. Christos*, 996 F.2d 1490, 1504 (3d Cir. 1993), *abrogated on other*

*grounds, Albright v. Oliver*, 510 U.S. 266, 114 S. Ct. 807, 127 L. Ed. 2d 114 (1994), *as*

*recognized in Bamont v. Pa. SPCA*, 163 F. Supp. 3d 138, 147 n.50 (E.D. Pa. 2016).

Accordingly, the Court finds that Defendants are not entitled to qualified immunity with

respect to Plaintiff's secition1983 Fourth Amendment false arrest claims.

Next, Defendants argue that Detective Bauer is entitled to qualified immunity for

Plaintiff's section 1983 claim against her for violation of the Fourth Amendment by way of

malicious prosecution. (Doc. 59 at 17, 25).

> To prove malicious prosecution under section 1983, a plaintiff must show that:
> (1) the defendants initiated a criminal proceeding; (2) the criminal proceeding
> ended in plaintiff's favor; (3) the proceeding was initiated without probable
> cause; (4) the defendants acted maliciously or for a purpose other than
> bringing the plaintiff to justice; and (5) the plaintiff suffered deprivation of
> liberty consistent with the concept of seizure as a consequence of a legal
> proceeding.

---

[7] Defendants cite *Hawk v. Brosha*, 590 F. Supp. 337 (E.D. Pa. 1984), in support of their Motion.
The Court in *Hawk*, however, determined "that the District Attorney's Office had substantial grounds to
believe that plaintiff had directly taken part in the crimes charged or could be held liable for these crimes
under a conspiracy theory." *Id*. at 343. As explained above, there are disputes of fact in the present case
that prevent the Court from finding that probable cause existed as a matter of law at the time of the arrest.
Further, unlike the present case, there was no evidence in *Hawk* that the defendant-detective falsified an
affidavit for an arrest warrant. Thus, *Hawk* provides Defendants no support.

24

*Estate of Smith*, 318 F.3d at 521.

With respect to the first qualified immunity prong, the same unresolved factual dispute that prevented this Court from concluding that there was probable cause to arrest Plaintiff, also prevents holding that the criminal proceeding against Plaintiff was initiated with probable cause and, therefore, that no constitutional right was violated. *See Montgomery*, 159 F.3d at 124; *Estate of Smith*, 318 F.3d at 514. As for the second qualified immunity prong, "the right to be free from prosecutions on criminal charges that lack probable cause was . . . known and clearly established at the time that [Detective Bauer] prepared [her] affidavit." *Andrews*, 853 F.3d at 705 (citing *Donahue v. Gavin*, 280 F.3d 371, 380 (3d Cir. 2002)). Accordingly, the Court finds that Detective Bauer is not entitled to qualified immunity with respect to Plaintiff's section 1983 Fourth Amendment malicious prosecution claim.

Defendants next seek dismissal of Plaintiff's section 1983 claim against Detective Bauer and ADA Tigue for misuse/abuse of process on the basis of qualified immunity. (Doc. 59 at 17). "An abuse of process claim is actionable under § 1983." *Felker v. Christine*, 796 F. Supp. 135, 142 (M.D. Pa. 1992). "The claim can be maintained '[w]hen process is used to effect an extortionate demand, or to cause the surrender of a legal right, or is used in any other way not so intended by proper use of the process.'" *Id*. (alteration original) (quoting *Brown v. Johnston*, 675 F. Supp. 287, 290 (W.D. Pa. 1987)). Unlike claims for false arrest and malicious prosecution, however, "in a malicious abuse of process

case, presence or absence of probable cause is irrelevant." *Jennings v. Shuman*, 567 F.2d

1213, 1218 (3d Cir. 1977). This is because "a section 1983 claim for malicious abuse of

process lies where 'prosecution is initiated legitimately and thereafter is used for a purpose

other than that intended by the law.'" *Rose v. Bartle*, 871 F.2d 331, 350 n.17 (3d Cir. 1989)

(quoting *Jennings*, 567 F.2d at 1217). When evaluating the claim, "the only thing that is

important is the purpose for which [the process] is used. Therefore, presence or absence of

probable cause is not important." *Jennings*, 567 F.2d at 1218.

That is not to say that the two claims cannot or do not ever overlap. Indeed, if a

criminal prosecution "is wrongfully initiated and thereafter perverted, both torts lie." *Id*. The

court in *Jennings* provided the following example to illustrate the difference between the two

causes of action:

> if the defendant justifies issuance of process by untruthfully saying that the
> plaintiff solicited burglary and uses the process only to have him jailed, this is
> malicious use only.[8] It is not malicious abuse because jailing is the purpose
> for which criminal process was intended. If the defendant has process issued
> based on the truthful statement that the plaintiff solicited burglary and then
> uses the threat of prosecution for purposes of extortion, this is malicious
> abuse only. Finally, if, as is alleged in the present case, the defendant has

---

[8] Malicious use of process is the term generally used when the underlying prosecution is civil in
nature while malicious prosecution is the term used when the underlying prosecution is criminal in nature.
*See Harvey v. Pincus*, 549 F. Supp. 332, 340 (E.D. Pa. 1982) (noting that claims for "malicious prosecution,
. . . when founded on civil prosecutions, are usually described as malicious use of civil process" (quoting
*Publix Drug Co. v. Breyer*, 32 A.2d 413, 415 (Pa. 1943))) *aff'd* 716 F.2d 890 (3d Cir. 1983); *Dietrich Indus.,
Inc. v. Abrams*, 455 A.2d 119, 206 n.3 (Pa. Super. Ct. 1982); *see also* 8 STUART M. SPEISER, CHARLES F.
KRAUSE, & ALFRED W. GANS, AMERICAN LAW OF TORTS § 28:20 (2011) ("Actions for malicious prosecution
and malicious use of process are essentially synonymous with most cases referring to malicious
prosecution as arising out of a criminal proceeding and malicious use of process as arising out of a civil
proceedings.")

26

> process served based on false statements and uses threat of prosecution for
> purposes of extortion, both torts will lie.

*Id.* at 1219. Thus, as illustrated in the above example, "[t]o establish a claim for abuse of

process, there must be some proof of a definite act or threat not authorized by the process,

or aimed at an objective not legitimate in the use of the process." *Bristow v. Clevenger*, 80

F. Supp. 2d 421, 431 (M.D. Pa. 2000) (quotation marks omitted). Accordingly, "[e]xamples

of actions that are recoverable under the abuse of process tort are extortion by means of

attachment, execution or garnishment, and blackmail by means of arrest or criminal

prosecution." *Id.* (quotation marks omitted).

Here, there is no evidence in the record that the criminal proceeding against Plaintiff

was used by either ADA Tigue or Detective Bauer "for a purpose other than that intended by

the law." *See Jennings*, 567 F.2d at 1217. Indeed, it does not appear that there is even an

allegation, much less any facts supporting such an allegation, that Defendants used the

criminal proceeding against the Plaintiff for a nefarious purpose. Instead, the record shows

that Defendants maintained the action in an effort to obtain a criminal conviction, a result

clearly authorized by Pennsylvania criminal law. To the extent that Plaintiff's claim is based

on the idea that the criminal process was abused because the prosecution was pursued

without probable cause, this is not a viable theory of recovery for an abuse of process claim.

*See Jennings*, 567 F.2d at 1218-19.

Accordingly, the Court finds that the undisputed facts show that no constitutional

right was violated by Defendants maintaining the criminal action against Plaintiff. For that

reason, Defendants are entitled to qualified immunity on Plaintiff's section 1983 abuse of process claim.[9]

## C. State Law Claims

Lastly, Defendants argue that Detective Bauer is entitled to official immunity with respect to the remaining common law tort claims against her. (Doc. 59 at 25-27). Pursuant to the Political Subdivision Tort Claims Act, 42 Pa. C.S.A. § 8541 et seq. ("PSTCA"), "[a]n employee of a local agency is liable for civil damages on account of any injury to a person or property . . . only to the same extent as his employing local agency." 42 Pa. C.S.A. § 8545. Local agencies, in turn, enjoy broad immunity from tort liability subject to eight exceptions that are not applicable to this case. 42 Pa. C.S.A. §§ 8541, 8542(b). By its terms, however, an employee of a local agency is not provided immunity when the employee's conduct "constituted a crime, actual fraud, actual malice or willful misconduct." 42 Pa. C.S.A. § 8550.

The Pennsylvania Supreme Court has recognized willful misconduct as requiring "a demanding level of fault." Sanford v. Stiles, 456 F.3d 298, 315 (3d Cir. 2006). "Willful misconduct has been defined by the Pennsylvania Supreme Court as 'conduct whereby the actor desired to bring about the result that followed or at least was aware that it was substantially certain to follow, so that such desire can be implied.'" Id. (quoting Renk v. City of Pittsburgh, 641 A.2d 289, 293 (Pa. 1994)). "[E]ven where a public employee acts with a

---

[9] Additionally, because there is no evidence that the criminal process was abused, the Court will also dismiss Plaintiff's state law claim for abuse of process against Detective Bauer.

degree of culpability equivalent to 'recklessness,' Pennsylvania law nevertheless affords him immunity." *Bright v. Westmoreland Cty.*, 443 F.3d 276, 287 (3d Cir. 2006).

As discussed above, there is a genuine dispute of fact as to whether Detective Bauer included information in her affidavit of probable cause that she knew to be false. If Detective Bauer did indeed place information in her affidavit of probable cause that she knew was false in an attempt to establish probable cause, this would constitute willful behavior not protected by official immunity. As the affidavit led to both Plaintiff's arrest and prosecution, the Court cannot, on the record before it, hold that Detective Bauer is entitled to official immunity on the false arrest and malicious prosecution claims. *See Heron v. City of Phila.* 987 F. Supp. 400, 405 (E.D. Pa. 1997) (finding that "[b]ecause [the plaintiff's claim of false arrest was] based on acts that might be willful misconduct, the defendants [were] not entitled to immunity for them"); *Eckman v. Lancaster City*, 742 F. Supp. 2d 638, 657 (E.D. Pa. 2010) (denying entry of summary judgment on false arrest and malicious prosecution claims because of a dispute of fact as to whether the defendant acted with malice).

## V. CONCLUSION

For the reasons outlined above, this Court will grant in part and deny in part Defendants' Amended Motion for Summary Judgment, (Doc. 58). A separate Order follows.

Robert D. Mariani
United States District Judge

$8/14/17$